# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

A.M.R., a minor, by and through DARLA Y.
REAGIN, as Mother and Next Friend; and
RONALD K. REAGIN, as Executor of the
Estate of MARTIN PARNELL REAGIN,
deceased,

    Plaintiffs,

vs.

GLYNN COUNTY, GEORGIA; CHIEF
MATT DOERING, in his official capacity as
Glynn County Chief of Police; and
SERGEANT CRAIG BROWN, individually
and in his official capacity as Officer of Glynn
County Police Department,

    Defendants.

CV 211-003

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by Defendants Glynn County, Sergeant Craig Brown, and Chief Matt Doering. See Dkt. No. 26. For the reasons stated below, Defendants' motion is **GRANTED**.

### BACKGROUND

This case arises from the tragic death of Martin Reagin ("Reagin"). The task before this Court is a narrow one. The issues raised in this lawsuit require the Court to decide only

1

the issue of whether these Defendants violated the United States Constitution when Reagin was fatally shot following his lengthy standoff with police. The undisputed facts show that Reagin, who suffered from mental illness, had threatened police officers, changed into camouflage, refused repeated commands to cooperate, pointed a gun at officers, and shouted that he desired to shoot an officer in the eyes. Taking into consideration the entirety of the undisputed facts, no violation of the United States Constitution occurred.

On the afternoon of September 10, 2009, two Glynn County Code Enforcement Officers—Mickey Milton and Robin Hummel—were on patrol on St. Simons Island when they saw an auction sign in the right-of-way in front of a house. Dkt. No. 26, Ex. 2 ¶ 1. Because a Glynn County ordinance prohibits signs in a right-of-way, Milton and Hummel stopped their vehicle, a truck marked as "Glynn County Code Enforcement." Dkt. No. 26, Ex. 2 ¶ 2; Dkt. No. 37, 37:15-18. The officers intended to give the homeowner a copy of the sign ordinance and to explain that the sign needed to be moved. Dkt. No. 26, Ex. 2 ¶ 2. Milton and Hummel had removed two or three signs several weeks earlier from the same residence. Dkt. No. 26, Ex. 2 ¶ 3. The homeowner, Reagin, had not been home when they had removed the earlier signs. See Dkt. No. 26, Ex. 2 ¶ 4.

Reagin noticed Milton and Hummel's presence on his property and ran outside to confront them. See Dkt. No. 26, Ex. 2 ¶ 6. Reagin, a forty-six year old man, had a long history of mental illness, including bipolar disorder. See Dkt. No. 26, Ex. 2 ¶ 5. Reagin screamed at Milton and Hummel and grabbed a trashcan and threw it towards the code enforcement officers and their truck. Dkt. No. 37, 38:16-25.[1] Milton also testified that Reagin proceeded to hit the side of the truck with his hands. Dkt. No. 37, 41:12-16. Reagin did not, however, cause any damage to the truck. Dkt. No. 37, 42:5-9. Milton called 911 and described the situation to the operator. Dkt. No. 37, 43:7-8. While Milton and Hummel waited for the police officers to arrive, Reagin threatened to kill them. Dkt. No. 37, 58:3-10.

Glynn County Police Officers Talbert and Blades arrived on the scene. See Dkt. No. 26, Ex. 2 ¶¶ 12, 17. Reagin, still extremely upset, yelled at the officers to "[g]et the fuck off

---

[1] The Court takes the facts in the light most favorable to the nonmoving party to the extent those facts are supported by the record. Penley v. Enslinger, 605 F.3d 843 (11th Cir. 2010). Plaintiffs generally controverted several paragraphs of the Defendants' Statement of Material Facts. See Dkt. Nos. 26 Ex. 2, 30. However, Plaintiffs do not point to any evidence that would undermine or contradict the factual assertions made by Defendants in those controverted paragraphs, nor have they provided an alternate account of the controverted paragraphs. "To controvert something is 'to oppose or contest by action or argument; to dispute or contest' or 'to dispute or oppose by reasoning.'" Ballecillo v. Wall to Wall Residence Repairs, Inc., 595 F. Supp. 2d 1374, 1378 (S.D. Fla. 2009). Thus, merely stating that a paragraph is controverted is insufficient to actually do so. Additionally, the Court has undertaken an independent review of the entire record and found no facts to controvert the noted assertions.

AO 72A
(Rev. 8/82)

of [his] property" and warned them that if they did not, they would "regret it." Dkt. No. 26, Ex. 2 ¶ 19. Reagin would wander in and out of his house. On one of his trips outside, Reagin went to his car, which was parked in the front yard, and retrieved a small box. Dkt. No. 26, Ex. 2 ¶ 21. Because of the size and shape, Officer Blades recognized the box as a box of ammunition. Dkt. No. 32, 20:7-11. Shortly after Reagin reentered the house with the box, both Officers Blades and Talbert saw, through a window, Reagin carrying a long-barreled gun. See Dkt. No. 26, Ex. 2 ¶ 22.

After a few minutes, Reagin again exited the house and appeared to be unarmed. Dkt. No. 26, Ex. 2 ¶ 24. Reagin threatened the officers, yelling, "You have got three seconds to get off my property or you're going to regret it." Dkt. No. 26, Ex. 2 ¶ 25. Because Reagin appeared unarmed, Officer Blades saw an opportunity to take Reagin into custody. Dkt. No. 26, Ex. 2 ¶ 26. Officer Talbert aimed his taser at Reagin and told Reagin to show both hands. Dkt. No. 26, Ex. 2 ¶ 27. Instead of complying, Reagin turned and ran. Dkt. No. 38, 44:1-2. Officer Talbert pursued him but tripped, giving Reagin a chance to retreat back into his house. Dkt. No. 38, 442-10. Officer Blades stated that, after this failed arrest attempt, Reagin changed into camouflage clothing. Dkt. No. 32, 37:18-21.

4

Another Glynn County Police Officer, Defendant Sergeant Craig Brown arrived on the scene. Dkt. No. 26, Ex. 2 ¶ 31. While Sergeant Brown exited his vehicle, he was warned by another officer to "[l]ook out" because Reagin had a gun. Dkt. No. 26, Ex. 2 ¶ 31. When Sergeant Brown then looked toward the house, he could see Reagin holding a gun. Dkt. No. 26, Ex. 2 ¶ 32. Sergeant Brown positioned himself on the second-story porch of Reagin's next-door neighbor. Dkt. No. 26, Ex. 2 ¶ 33. From that vantage point, Sergeant Brown could see inside Reagin's house and was able to observe Reagin walking through the house with a gun. Dkt. No. 26, Ex. 2 ¶ 33.

The next officer to arrive on the scene was Officer Eric Naugle, who knew Reagin well because he was Reagin's nephew by marriage. Dkt. No. 34, 6:10-11. Officer Naugle knew, and communicated to the other officers, that Reagin was an avid hunter and owned "scoped firearms." Dkt. No. 26, Ex. 2 ¶ 35; Dkt. No. 34, 30:13-22. Because of his relationship with Reagin, Officer Naugle received permission from his supervisor to speak directly with Reagin in an effort to end the standoff. Dkt. No. 26, Ex. 2 ¶ 36. Using a public address system, Officer Naugle coaxed Reagin into stepping outside of the house. Dkt. No. 26, Ex. 2 ¶ 37.

Reagin first spoke with his nephew stating repeatedly that he had "not done anything." Dkt. No. 26, Ex. 2 ¶ 40. However,

Reagin then turned his attention to Officer Blades, who was providing cover for Officer Naugle. Dkt. No. 26, Ex. 2 ¶¶ 39, 41. Reagin walked toward Officer Blades shouting at him. Dkt. No. 26, Ex. 2 ¶¶ 41-42. Reagin told Officer Blades that he was "going to die" because Reagin was "going to shoot [him] right in [his] glasses." Dkt. No. 26, Ex. 2 ¶¶ 43-44. Reagin also taunted Officer Blades by shouting that Reagin was "going to cut [Officer Blade's] head off." Dkt. No. 26, Ex. 2 ¶¶ 43-44. Then, Reagin abruptly went back into his house and picked up a rifle he had placed next to the door. Dkt. No. 26, Ex. 2 ¶ 45.

Sometime later, Reagin called 911 and asked to be connected to Officer Naugle. Dkt. No. 26, Ex. 2 ¶ 46. During their conversation, Reagin said that he was looking at officers through the scope of his rifle. Dkt. No. 26, Ex. 2 ¶ 47. Officer Nagule passed this information on to the other officers, including Sergeant Brown. Dkt. No. 26, Ex. 2 ¶ 48; Dkt. No. 33, 23:1-5. Sergeant Brown was also told that Reagin had specifically mentioned Sergeant Brown by describing Sergeant Brown's location on the neighbor's porch. Dkt. No. 26, Ex. 2 ¶ 48; Dkt. No. 33, 23:1-5. Sergeant Brown adjusted his position on the porch as a result. Dkt. No. 26, Ex. 2 ¶¶ 48-49. At some point, Sergeant Brown and the other officers were told that Reagin had told Officer Nagule that the officers needed to "hunker down" because Reagin was going to come out of the

residence and presumably attack them. Dkt. No. 36, 49:1-11. Sergeant Brown was also informed that an officer had seen a knife tucked into the back of Reagin's waistband. Dkt. No. 33, 48:16-49:12.

The SWAT officers formed a plan to take Reagin into custody by using non-lethal force. Dkt. No. 26, Ex. 2 ¶¶ 52-54. Officer Nagule would draw Reagin out of the house by telling him that, if he came outside unarmed and received a citation, the officers would leave. Dkt. No. 26, Ex. 2 ¶ 54. The plan contained two lines of attack. Once Reagin was on his front porch, a SWAT officer would tase Reagin. Dkt. No. 26, Ex. 2 ¶¶ 52-53. If the taser did not work, then a second SWAT officer would begin firing non-lethal rounds at Reagin. Dkt. No. 26, Ex. 2 ¶ 53. The SWAT team had not devised a third line of attack if both the taser and the non-lethal rounds failed. Dkt. No. 39, 34:6-10.

Sergeant Brown was not informed of the SWAT team's plan because all SWAT team communications are broadcast over an encrypted network. See Dkt. No. 32, 10:19-22. This is a safety measure so that SWAT communications cannot be accessed by members of the public through equipment such as a police scanner. See Dkt. No. 32, 10:19-22. Thus, patrol officers, such as Sergeant Brown, did not have access to the SWAT team's communications. Dkt. No. 33, 26:5-10.

7

Officer Naugle was able to convince Reagin to come outside to receive a citation. Dkt. No. 26, Ex. 2 ¶ 54. According to the plan, the first SWAT officer fired a taser at Reagin. Dkt. No. 26, Ex. 2 ¶ 40. When the taser prongs hit Reagin and the taser discharged its shock, Reagin began falling forward, but the taser prongs were either dislodged or failed to make a good connection. Dkt. No. 26, Ex. 2 ¶ 59. Thus, Reagin stumbled off the steps but then stood up, apparently unfazed by the taser. Dkt. No. 26, Ex. 2 ¶ 60. The second SWAT officer then began firing non-lethal rounds at Reagin. Dkt. No. 26, Ex. 2 ¶¶ 61-63. Although two of the rounds made contact with Reagin, neither incapacitated him. Dkt. No. 26, Ex. 2 ¶ 62. Reagin managed to run around the side of the house and into his back yard despite the fact that being hit by a taser and non-lethal rounds generally is more "than the typical person can handle." Dkt. No. 39, 31:9-15.

Sergeant Brown, who was unable to see what had occurred in the front yard, saw Reagin run into the backyard and dart behind a sizeable boat parked near the side of the house. See Dkt. No. 26, Ex. 2 ¶¶ 64-71; Dkt. No. 36, 69:21-24. Sergeant Brown stated that, when he first saw Reagin running, he did not see a gun, so Sergeant Brown was going to chase Reagin. Dkt. No. 33, 28:22-24. However, once Reagin had ducked down behind the boat,

Sergeant Brown thought he saw a weapon in Reagin's hand even though Reagin was, in fact, unarmed.[2] Dkt. No. 33, 29:1-5.

Sergeant Brown concluded that Reagin was positioning himself so that Reagin would be able to attack the officers pursuing him. Dkt. No. 33, 34:20-23. From where Reagin was crouching, he was partially covered by the boat, and the pursuing officers would have difficulty spotting him. Dkt. No. 33, 34:20-23. Sergeant Brown yelled for Reagin to stop, but Reagin kept moving. Dkt. No. 33, 29:7-9. Sergeant Brown then fired three shots at Reagin. Dkt. No. 26, Ex. 2 ¶¶ 76-77. Reagin ran into his house. Dkt. No. 26, Ex. 2 ¶¶ 76-77. After waiting approximately forty minutes, the police fired tear gas into the house and entered. Dkt. No. 26, Ex. 2 ¶ 80. Once inside, they found Reagin dead, killed by one of Sergeant Brown's shots. Dkt. No. 26, Ex. 2 ¶ 81.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no

---

[2] Plaintiffs argue that this Court cannot consider Brown's testimony that he thought he saw a weapon handle in Reagin's hand because, for summary judgment purposes, the court must view the facts in the light most favorable to the non-moving party. See Dkt. No. 29. Plaintiffs' argument, however, is misguided. While this Court certainly must view the facts in the light most favorable to Plaintiffs, Plaintiffs have not disputed that Sergeant Brown *thought* he saw a weapon; they have disputed whether Reagin did in fact have a weapon. Thus, while this Court is required to assume that Reagin did not have a weapon when Sergeant Brown shot him, this Court is not required to disregard Sergeant Brown's testimony about his belief that Reagin did have a weapon.

9

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

However, "[i]n the context of qualified immunity analysis, the Supreme Court has cautioned that if a court were 'to deny summary judgment any time a material issue of fact remains on the excessive force claim,' it might 'undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" Penley, 605 F.3d at 849 (citing Saucier v. Katz, 533 U.S. 194, 202, (2001)). Therefore,

> When a district court considers the record in [the light most favorable to the party asserting the injury], it eliminates all issues of fact. By approaching the record in this way, the court has the plaintiff's best case before it. With the plaintiff's

> best case in hand, the court is able to move to the
> question of whether the defendant committed the
> constitutional violation alleged in the complaint
> without having to assess any facts in dispute. Thus,
> because material issues of disputed fact are not a
> factor in the court's analysis of qualified immunity
> and cannot foreclose the grant or denial of summary
> judgment based on qualified immunity[,] we decline to
> entertain [a plaintiff's] arguments concerning the
> allegedly disputed facts.

Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). In other words, "[a]t the summary judgment stage, ... once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record,* the reasonableness of [the officer's] actions ... is a pure question of law." Scott, 550 U.S. at 381 n. 8 (citations omitted).

**DISCUSSION**

Because Reagin's Fourth Amendment rights were not violated, summary judgment is appropriate. Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). This "calculus . . . embod[ies] allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. "[T]he question is

whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." Id. at 397. Specifically, the Eleventh Circuit has articulated three factors for evaluating the use of force. See Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009). These factors are: (1) the severity of the crime at issue; (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. Id. Applying those factors to the present case, this Court finds that Sergeant Brown's use of deadly force was reasonable. All three of the factors weigh in favor of granting summary judgment.

In terms of the first factor, Reagin committed extremely serious offenses. While the incident arose initially from a sign ordinance violation, that is not the crime that summoned the police to the scene. The police were called because Reagin had threatened the code enforcement officers and had thrown a large trashcan towards them. Once the police arrived, the offenses Reagin committed became increasingly more severe.

Reagin's actions were equally, if not more serious, then the decedent's actions in Penley v. Eslinger. 605 F.3d at 851. In Penley, a middle school student brought a toy gun to school, threatened the lives of students, and refused to comply with officers' commands that he drop his weapon. Id. at 851. The

12

Eleventh Circuit, in determining that using lethal force against the student was reasonable, described those actions as "undoubtedly serious crimes." Id. Likewise, in this case, the severity of Reagin's behavior weighs heavily in favor of Sergeant Brown's actions. Reagin committed numerous assaults against peace officers and repeatedly ignored officers' commands.

The second factor evaluates the threat Reagin posed to the officers or others. This factor "can be reduced to a simple question: 'whether, given the circumstances, [the suspect] would have appeared to reasonable officers to have been gravely dangerous." Id. In evaluating the second factor, this Court must consider the reasonableness of Sergeant Brown's conclusion that Reagin was armed. See Riordan v. O'Shea, 448 Fed. App'x 928, 931 (11th Cir. 2011) (determining whether it was reasonable for an officer to conclude the suspect had a "dangerous weapon," even though the object "turned out to be a wooden chair spindle").

Even though mistaken,[3] Sergeant Brown's conclusion that Reagin was armed was entirely reasonable. Reagin had repeatedly made the officers painfully aware that Reagin owned an array of

---

[3] As mentioned above, this Court will assume that Reagin did not have a weapon when he was shot. Whether that was indeed the case is certainly in dispute. When he was found dead, Reagin had both a rifle and a "big butcher knife" with a "brown handle" lying nearby. Dkt. No. 39, 43:21-25, 44:3-5, 47:7-10.

13

deadly weapons and that he was skilled at using them. Sergeant Brown had himself seen Reagin holding firearms. Fellow officers had also informed Sergeant Brown that Reagin had previously hidden a knife in his waistband. Reagin's position behind the boat could easily have been interpreted as an effort to prepare to attack the officers pursuing him. Furthermore, Reagin's change into camouflage clothing could indicate that Reagin had at least contemplated using stealth. Reagin had also threatened to shoot an officer in the eyes. An officer is not required to be absolutely certain that a suspect is armed in order to use deadly force. See id. Given the situation, it was reasonable for Sergeant Brown to conclude that his fellow officers' lives were at risk.

Plaintiffs place great emphasis on the fact that Reagin had agreed to come out unarmed to receive a citation and that, because of Chief Doering's actions, Sergeant Brown was not aware of that information. However, even if Sergeant Brown had known that Reagin agreed to be unarmed, it would still be reasonable for Sergeant Brown to conclude that Reagin possessed a weapon. Reagin had previously demonstrated that he was defiant, volatile, and capable of concealing weaponry in his clothing.

Plaintiffs analogize the present case to cases holding that deadly force against an unarmed, fleeing suspect is unreasonable. See Dkt. No. 29 (citing Hernandez v. City of

14

Miami, 302 F. Supp. 2d 1373 (S.D. Fla. 2004)). Those cases are readily distinguishable because, from Sergeant Brown's perspective, Reagin was neither unarmed nor fleeing. As discussed above, Sergeant Brown's mistaken belief that Reagin was armed was reasonable. Furthermore, Reagin was not fleeing when he was shot. Reagin had stopped running and was crouched behind a boat, possibly so that he could attack the officers following him. In sum, Reagin posed a legitimate threat to the officers on the scene and the second factor also weighs in favor of Sergeant Brown's use of deadly force.

The third and final factor this Court must evaluate is whether Reagin was resisting arrest. Clearly he was. Indeed, it is difficult to imagine what more Reagin could have done to resist arrest. Plaintiffs contend that Reagin had stopped resisting arrested and had "surrendered" to police authority when he agreed to walk outside, unarmed, to receive a citation. See Dkt. No. 46. That argument is unpersuasive for several reasons. First, Sergeant Brown did not shoot Reagin when he walked out on the porch to receive a citation. Reagin was shot after the SWAT team's two-pronged attack failed. Second, Reagin never agreed to be taken into custody. He only agreed to recieve a citation. Third, even though Reagin may have been calmer when he walked out onto his porch, he had proven himself to be volatile and unpredictable. Fourth, after being both

tased and shot with non-lethal rounds, Reagin, rather than surrendering to police authority, ran off and demonstrated that he was still actively resisting arrest. For these reasons, the third factor also supports this Court's conclusion that Sergeant Brown did not violate Reagin's constitutional rights.

All of Plaintiffs' other remaining claims must also be dismissed. If Sergeant Brown did not commit a Fourth Amendment violation, Chief Doering cannot be held liable as his supervisor. Plaintiffs argue that Chief Doering's actions created a risk that Reagin's constitutional rights would be violated. Without a resulting violation, however, Plaintiffs cannot prevail on a § 1983 claim. See Penley, 605 F.3d at 854-55 (concluding that a sheriff could not be liable in his official capacity under § 1983 for allegedly formulating use-of-force policy that allowed deadly force to be used without prior warning if the policy did not cause a Fourth Amendment violation). Nor can Glynn County be held liable in the absence of an underlying constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that to succeed on a § 1983 claim against municipality, the plaintiff must have suffered a constitutional injury). Additionally, Plaintiffs admitted during the June 19th motions hearing that they were no longer pursuing the conspiracy claim or any of the state law claims. See Dkt. No. 52. Under Georgia law, sovereign immunity

tased and shot with non-lethal rounds, Reagin, rather than surrendering to police authority, ran off and demonstrated that he was still actively resisting arrest. For these reasons, the third factor also supports this Court's conclusion that Sergeant Brown did not violate Reagin's constitutional rights.

All of Plaintiffs' other remaining claims must also be dismissed. If Sergeant Brown did not commit a Fourth Amendment violation, Chief Doering cannot be held liable as his supervisor. Plaintiffs argue that Chief Doering's actions created a risk that Reagin's constitutional rights would be violated. Without a resulting violation, however, Plaintiffs cannot prevail on a § 1983 claim. See Penley, 605 F.3d at 854-55 (concluding that a sheriff could not be liable in his official capacity under § 1983 for allegedly formulating use-of-force policy that allowed deadly force to be used without prior warning if the policy did not cause a Fourth Amendment violation). Nor can Glynn County be held liable in the absence of an underlying constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that to succeed on a § 1983 claim against municipality, the plaintiff must have suffered a constitutional injury). Additionally, Plaintiffs admitted during the June 19th motions hearing that they were no longer pursuing the conspiracy claim or any of the state law claims. See Dkt. No. 52. Under Georgia law, sovereign immunity

would clearly bar Plaintiffs' claim against Glynn County. See O.C.G.A. § 36-1-4. Georgia law would also not allow Plaintiffs to recover from Sergeant Brown or Chief Doering on state law claims. Georgia's doctrine of official immunity protects an official from liability for discretionary acts unless the official acted with malice or intent to injure. Gilbert v. Richardson, 264 Ga. 744, 753 (1994). The actions of Sergeant Brown and Chief Doering were undoubtedly discretionary and Plaintiffs have never alleged that their actions were taken out of malice. Therefore, Defendants are entitled to judgment as a matter of law on all claims.

## CONCLUSION

Based on the foregoing, summary judgment is appropriate with regards to all Defendants on all claims. Accordingly, Defendants' Motion for Summary Judgment, Dkt. No. 26, is **GRANTED**. The Court of Clerk is directed to enter the appropriate judgment.

**SO ORDERED**, this 18th day of December, 2012.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA